# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

BERNIE BONDAR, DENNIS BONDAR,
JILL BONDAR, and MIKE BONDAR,

        Plaintiffs,

    v.                           Case No. 06-C-109

MICHAEL D'AMATO
(in his individual capacity),

        Defendant.

---

## DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

### I. BACKGROUND

This action was commenced on January 23, 2006, when the plaintiffs, Bernie Bondar, Dennis Bondar, Jill Bondar, and Mike Bondar ("the Bondars") filed a complaint in the United States District Court for the Eastern District of Wisconsin alleging that they were retaliated against for exercising their First Amendment rights in violation of 42 U.S.C. § 1983.

The Bondars allege that Michael D'Amato ("D'Amato") engaged in the following actions in retaliation against them because of their speech in opposition to the Overlay Project, a project which D'Amato favored: (1) D'Amato removed a sign that advocated opposition to the Overlay Project that was posted by Jill Bondar, (2) D'Amato referred the Bondars' tavern, Wolski's, to the City of Milwaukee's Utilities and Licensing Committee, and (3) D'Amato engaged in a campaign of petty harassment of the Bondars, which included the sign removal incident, D'Amato's referral of

Wolski's to the licensing committee, as well as D'Amato's public remarks criticizing the Bondars in a local newspaper.

Currently before the court is the defendant's motion for summary judgment, which motion is predicated on the doctrine of qualified immunity. The defendant's motion is now fully briefed and is ready for resolution. For the reasons which follow, the defendant's motion will be granted in part and denied in part.

## II. FACTS

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the defendant's motion for summary judgment was accompanied by a set of proposed findings of fact. The plaintiffs filed responses to the proposed findings of fact set forth by the defendant. The plaintiffs filed their own additional proposed findings of fact, and the defendant filed his responses thereto. A review of the parties' respective proposed findings and the responses thereto reveal that the following are (except where noted) the undisputed facts that are relevant[1] to the disposition of the motion for summary judgment.

The plaintiffs, Bernie Bondar, Dennis Bondar, Jill Bondar, and Michael Bondar, all live or do business in the City of Milwaukee. (Def.'s Proposed Finding of Fact ["DPFOF"] ¶ 1.)

At all times relevant to this case, Jill Bondar has been a City of Milwaukee employee. (Pls.' Proposed Finding of Fact ["PPFOF"] ¶ 2.) At all times relevant to this case, Jill has lived in the neighborhood covered by the East Village Association ("EVA"). (PPFOF ¶ 3.)

---

[1] Each of the parties claim that some of their opponent's proposed findings of fact are irrelevant. Some of those allegedly irrelevant proposed findings have been included in the factual presentation of this decision in the interest of completeness, even though they indeed may prove to be irrelevant to the court's decision.

2

The defendant, Michael D'Amato, at all time pertinent to this lawsuit has been an Alderman in the City of Milwaukee representing the Third Aldermanic District. (DPFOF ¶ 2.) The Third Aldermanic District encompasses a portion of the City of Milwaukee that includes the area in which the plaintiffs reside or do business. (DPFOF ¶ 3.)

At all times pertinent to this lawsuit, the plaintiffs, Bernie, Michael, and Dennis Bondar, were officers of a corporation that owned a tavern named Wolski's which is also located within the aldermanic district represented by the defendant, D'Amato. (DPFOF ¶ 4.) Jill Bondar is not involved in running the tavern. (PPFOF ¶ 4.)

The plaintiffs have all either lived or done business in that part of Milwaukee for which there is a neighborhood association named the East Village Association ("EVA") and the aforementioned tavern, Wolski's, is located within that area. (DPFOF ¶ 5.)

In March of 2004, the EVA was seeking to have special zoning rules applied to a portion of its neighborhood, referred to as the Overlay District Project. (DPFOF ¶ 6.)

The Overlay District Project was to cover a sixteen block area in the neighborhood. It would have placed a higher level of zoning compliance on every property owner it covered. The Overlay District Project was supposedly designed to protect the historic nature of houses and buildings in the neighborhood, so any improvements or construction needed special approval, and had to be consistent with the stylistic rules that applied to the Overlay District Project. The special style rules would have increased the costs of making changes to buildings within the Overlay District Project. (PPFOF ¶ 8.) Also, the Overlay District Project rules would have prevented property owners from combining or dividing lots without special approval from the Department of City Development. (PPFOF ¶ 9.)

3

D'Amato publically supported the Overlay District Project. (PPFOF ¶ 10.) The Bondars opposed the Overlay District Project. They spoke out publically on the issue, and petitioned the government in an effort to stop the Overlay District Project. (PPFOF ¶ 11.)

One example of this speech against the Overlay District Project is a June of 2004 e-mail the Bondars sent to people in the neighborhood expressing opposition to the Overlay District Project. This e-mail was provided to D'Amato on or about June of 2004. (PPFOF ¶ 12.) Another example of speech and/or petition related to the Overlay District Project is a July 31, 2004, letter to the Mayor of Milwaukee from the Bondars. This letter opposed the Overlay Project and it accused D'Amato of ignoring the will of the people. This letter was signed by Bernie, Jill, and Mike Bondar. (PPFOF ¶ 13.)

Another example of the Bondars speaking out against the Overlay District Project involves a meeting held at Circa, a community bar, in June of 2004. Bernie, Jill, and Mike Bondar handed out fliers urging people to come to the meeting to oppose the Overlay District Project: the fliers stated that "our community is getting hijacked." The Bondars also spoke at the meeting. D'Amato was also at the meeting. (PPFOF ¶ 14.) The Bondars also spoke against the Overlay Project at EVA meetings. (PPFOF ¶ 15.)

The leadership of the EVA supported the Overlay District Project in 2004. Because both D'Amato and the leadership of the EVA supported the Overlay District Project, they worked closely together to get approval from the entire EVA to support the project. (PPFOF ¶ 16.)

At some point, Alderman D'Amato became aware that the Bondars opposed the Overlay District Project. (DPFOF ¶ 7.) Alderman D'Amato also became aware that the Bondars met with

the Mayor of the City of Milwaukee and expressed to the mayor their opposition to the Overlay District Project. (DPFOF ¶ 8.)

In November of 2004, there was an election for the EVA Board and Alderman D'Amato was aware that the Bondars were upset at the outcome of that election. (DPFOF ¶ 10.)

Alderman D'Amato was aware that one or more of the plaintiffs had an ownership interest in Wolski's, but he was not aware of which ones in particular had such an interest in that business. (DPFOF ¶ 12.)

In September of 2004, while traveling in an automobile with his aide, Alderman D'Amato noted that there was a sign opposing the Overlay Project stapled to a city tree located in the City's tree border between the street and public sidewalk in front of a home, but he did not then know who owned the house. (DPFOF ¶ 13.) The sign read, "No! Overlay District!!! <u>Ald. D'Amato</u>"." D'Amato ordered an assistant to tear down the sign. The sign was posted on a tree between the sidewalk and the road. It had been in place about one month before it was removed. (PPFOF ¶ 17.)

According to the plaintiffs, Jill Bondar pays taxes on the land on which the tree sits, and planted the flowers that were around the tree. (PPFOF ¶ 19.)

Alderman D'Amato was then aware that under Milwaukee ordinances, it was unlawful for a person to attach a sign to a City-owned tree. (DPFOF ¶ 14.)

Milwaukee Code of Ordinances § 244-18-1 makes it "Unlawful for any person, except a public officer or a government employee in the performance of a public duty, to maintain, place, erect, paint, paste, print, nail, tack or otherwise fasten any card, banner, picture, handbill, sign, poster, advertising, or notice of any kind, or cause the same to be done, on any curb, streetwalk, or public thoroughfare surface, fence, board, barrel, box, case, railing, pole, post, tree, barricade, material,

5

bridge, bridge fender, dock, pile, building or structure of any kind on public ground, or public waterway, within the City . . ." (DPFOF ¶ 15.)

Within a few days of the sign being removed, Alderman D'Amato learned that the sign had been placed in front of Jill Bondars' home on a City-owned tree, and he telephoned plaintiff Jill Bondar and left a message on her answering machine. D'Amato claims that in the message he indicated that (1) he was aware that she was an employee of the City of Milwaukee Department of Public Works; (2) given her position she should have known that City law prohibits placing a sign on a City-owned tree; (3) if she had any information concerning who had placed the sign on the tree, she should provide it to him; and (4) the sign would be returned to whomever had placed it on the tree as he had kept the sign. (DPFOF ¶ 16.)

The plaintiffs claim that, in the message, D'Amato never said that he was aware that Jill Bondar was a City employee; that given her employment with the government she should have known that it was illegal to place a sign on a City tree; or that D'Amato would give the sign back to whomever put it up. (PPFOF ¶ 22.) Instead, according to the plaintiffs, D'Amato stated that he received a call from someone telling him that Jill could help him find out who posted the "No Overlay District" sign "illegally" on the trees in the public way, on the grass between the sidewalk and the street. He told Jill that she should have known that violated an ordinance. He further told her that several neighbors had complained, so people were sent to remove the signs. He stated that he personally observed one sign and removed it. He told Jill that the Department of Public Works and the Police were wondering if she had any information about who posted the sign so the police could give that person a ticket. He left his phone number and told Jill if she called him, he would put her in touch with the proper authorities. (PPFOF ¶ 21.)

6

Alderman D'Amato has on other occasions requested the removal of signs from City property that he noticed in travel within the City. Such signs related, for example, to job solicitations or business advertising. (DPFOF ¶ 17.)

Because the Bondars opposed the Overlay District Project, they sought to be elected to the EVA board, to change the leadership and direction of the association. (PPFOF ¶ 23.) In the fall of 2004, they attended a nomination meeting for officers at the EVA, and Bernie, Jill, and Mike Bondar were nominated officers. (PPFOF ¶ 22.)

In November of 2004, there was an election for the EVA board, which was attended by Alderman D'Amato. According to the plaintiffs, there were many irregularities with respect to that election. First, when Mike Bondar arrived, he saw that there were already ballots in the box. Second, the nominating rules had been ignored: people not nominated at the prior meeting were allowed to be on the ballot. Third, the voting rules were changed at that meeting, without a vote from the members. These irregularities resulted in a pro-Overlay District Project leadership being elected. (PPFOF ¶ 23.)

At future EVA meetings, the Bondars spoke our about improprieties of that election, and accused D'Amato of playing a role in those improprieties. D'Amato was present at several of those meetings. (PPFOF ¶ 24.)

According to the plaintiffs, over the years, and including in September of 2004, Mike Bondar witnessed innumerable signs posted on trees and in the grassy area between the sidewalk and the road. Again, according to the plaintiffs, the number of signs posted on city trees and in the area between the sidewalk and the road was especially high in September before a Presidential election. (PPFOF ¶ 27.)

7

On April 24, 2005, Alderman D'Amato received an e-mail form a constituent indicating that her tenant had telephoned her, and reported broken bottles smashed on the stoop in front of the property owner's building in the 1100 block of East Hamilton Street in Milwaukee, Wisconsin. (DPFOF ¶ 18.)

The property owner further indicated in the e-mail that she had swept the entire corner the previous week and that she had found "I closed Wolski's" stickers among the debris, and that she had made certain that she had cleaned up remnants of previously-broken bottles that had been smashed. (DPFOF ¶ 19.)

In the same e-mail, the property owner also indicated that she had informed the Milwaukee Police Department of this repeated vandalism and the property owner indicated that she thought this vandalism was related to the Overlay District Project and the people who opposed it. (DPFOF ¶ 20.)

At around the same time, Alderman D'Amato received two other telephone complaints from individuals concerning the operation of Wolski's, including one that indicated that a patron of the tavern had left and had driven an automobile into the side of a neighboring house. (DPFOF ¶ 21.) Those two other complainants, however, indicated to the alderman that they wished to remain anonymous and that they feared retaliation. (DPFOF ¶ 22.)

At the time of having received the e-mail complaint, D'Amato was aware that the customary practice of the City of Milwaukee Common Council Committee on Utilities and Licenses was to schedule a hearing to review the renewal of any tavern license once the City had received a formal, written neighbor complaint, as occurred with the e-mail that D'Amato had received. (DPFOF ¶ 23.)

8

In response to this citizen complaint, Alderman D'Amato requested that the Licenses Committee of the Common Council of the City of Milwaukee conduct a hearing on the request for the renewal of a license for Wolski's tavern.  (DPFOF ¶ 24.)

Given that Alderman D'Amato had received two other anonymous complaints, however, he advised the Licenses Division that it should give notice of any such hearing to area neighbors regarding any complaints that they may have concerning the tavern's operations as there may have been other neighbors who had such concerns, but were willing to express them and not remain anonymous.  (DPFOF ¶ 25.)

The notice of the hearing with respect to the license renewal was mailed to 656 addresses. (PPFOF ¶ 29.)  In all the 33 years that Mike and his brother were involved in managing the bar, this was the only time that they were called upon to defend the bar's license.  (PPFOF ¶ 30.)

D'Amato was aware at that time, however, that many homes nearby Wolski's were owned by one or more of the plaintiffs, that they are rental properties, and that the occupants of these homes are, therefore, tenants of one or more of the plaintiffs.  (DPFOF ¶ 26.)

At all times pertinent to this lawsuit, D'Amato was not a member of the Common Council Committee on Utilities and Licenses.  (DPFOF ¶ 27.)

Alderman D'Amato did not send any notice for the hearing on the review of the Wolski's tavern license and, in fact, the hearing notice was sent out over the name of the chairman of the committee.  (DPFOF ¶ 29.)

At the hearing conducted by the Committee on this renewal, Alderman D'Amato made the following statement to the Committee:

9

I had met with Mr. Bernie Bondar on Friday and told him that we received one complaint that we sent to the License Division, and as you know, when we receive a neighborhood complaint, we do schedule places that are up for normal renewal. We received three complaints in which people asked their names be withheld. They were from various areas around the bar within a couple of blocks, and we did receive one police complaint about a car leaving the tavern at closing time in which the person ran into a house at 1818 North Pulaski Street, and that person was cited for drunk driving, so there were some concerns.

I have representing this area for nine years, have not had complaints about Wolski's. The occasional complaint I think early on about closing time, but the gentlemen have always been responsible in making sure that the neighbors be respectable to the neighborhood, and we would just ask that they continue to do that in this area and that the neighbors would appreciate it.

(DPFOF ¶ 30.)

At the hearing, Alderman D'Amato made no further statements, and in particular, made no recommendations with regard to any action on the license. (DPFOF ¶ 31.)

The Utilities and Licenses Committee of the City of Milwaukee Common Council unanimously recommended renewal of the Wolski's license. (DPFOF ¶ 32.)

The renewal of the Wolski's license also passed the full Common Council unanimously, and Alderman D'Amato did not object to the renewal. (DPFOF ¶ 33.)

In October, 2005, D'Amato told a local newspaper that they (the Bondars) were willing to destroy anybody or anything to get their way; that they acted in narrow self interest; that they spread awful lies; that they were unneighborly; and that they did not contribute anything to the community. (PPFOF ¶ 31.)[2]

_____

[2] The plaintiffs have also submitted a proposed finding of fact that in an e-mail announcing a meeting of another neighborhood association, the Murray Hill Neighborhood Group, D'Amato referred to the Bondars as a "bunch of goons." The court, however, will not accept this proposed finding because the plaintiffs have not indicated when this comment was allegedly made.

10

## II.  DISCUSSION

As previously stated, the plaintiffs allege that D'Amato deprived them of their First Amendment right to free speech when he engaged in various retaliatory acts in response to the plaintiffs' speech in opposition to the Overlay District Project.  In response, D'Amato asserts that he is protected by the doctrine of qualified immunity from the Bondars' allegations of engaging in retaliatory acts.

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The court undertakes a two-part inquiry when determining whether a defendant is entitled to qualified immunity.  The threshold question is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendant's] conduct violated a constitutional right?"  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see Crawford El v. Britton*, 523 U.S. 574, 597-98 (1998) (stating that "the court must determine whether, assuming the truth of the plaintiff's allegations, the official's conduct violated clearly established law").  And, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.  However, if the facts alleged make out a constitutional violation, then the court must determine "whether the right was clearly established."  *Id.*  This inquiry is a specific one: "The relevant, dispositive inquiry is whether it would be clear to a reasonable [person] that the conduct was unlawful in the situation he confronted."  *Id.* at 202.  Furthermore, such inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Id.* at

11

201.  And, a right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  The action's unlawfulness must be "apparent" from pre-existing law.  *Id.*

The plaintiffs have the burden to show that the defendant violated their clearly established rights.  *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994).

> To meet [the clearly established law standard] we have "required case law which clearly and consistently recognized the constitutional right." . . . While cases involving the exact fact pattern at bar are unnecessary, case law in a closely analogous area is crucial to permit us to conclude that reasonably diligent government officials would have known of the case law, related it to the situation at hand, and molded their conduct accordingly.

*Lojuk v. Johnson*, 770 F.2d 619, 628 (7th Cir. 1985) (internal citation omitted), *cert. denied*, 474 U.S. 1067 (1986).

Thus, the first question before the court is, taking the facts in the light most favorable to the plaintiffs, whether D'Amato deprived the plaintiffs of their constitutional right to free speech. And, second, if so, were such rights clearly established at the time D'Amato engaged in the conduct giving rise to the plaintiffs' claims.  To reiterate, the plaintiffs allege that D'Amato engaged in the following retaliatory actions against them because of their speech in opposition to the Overlay Project: (1) D'Amato made remarks criticizing the Bondars in a local newspaper; (2) D'Amato removed a sign that advocated opposition to the Overlay Project that was posted by Jill Bondar, and then called Jill Bondar about the sign; and (3) D'Amato referred the Bondars' tavern, Wolski's, to the city's licensing committee.  The plaintiffs also assert that the aforementioned actions constitute a campaign of petty harassment against the Bondars in retaliation against them for their speech.  The court will

12

address each allegedly retaliatory action in turn, and then address whether the aforementioned actions give rise to a campaign of petty harassment in retaliation against the Bondars for their speech against the Overlay Project.

A. *Comments in Local Newspaper*

The plaintiffs allege that the following statements that D'Amato made to a local newspaper in October of 2005 constitute actionable retaliation: "These people [the Bondars and their allies against the Overlay Project], are trying to destroy anybody or anything that gets in the way of their narrow self-interest. A group of predominantly absentee landowners has tried to destroy people's lives and spread awful lies. They are some of the most unneighborly people I have ever met." (PPFOF ¶ 31; M. Bondar Aff., Ex. B.)

The First Amendment protects not only the affirmative right to speak, but also the "right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). By engaging in retaliatory acts, public officials place informal restraints on speech "allow[ing] the government to 'produce a result which [it] could not command directly.' Such interference with constitutional rights is impermissible." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (citation omitted). In order to ultimately prevail on the theory that their First Amendment rights were violated, the Bondars will have to show that "their speech was constitutionally protected, that [D'Amato] took an adverse action against [them], and that [this] action was motivated by [their] constitutionally protected speech." *Mosely v. Bd. of Educ. of the City of Chicago*, 434 F.3d 527, 533 (7th Cir. 2006).

Yet, not every retaliatory act committed by a public official is actionable under § 1983. *Villagrana v. Village of Oswego*, 2005 WL 2322808 (N.D. Ill. 2005) (citing *Suarez*, 202 F.3d at 687).

13

"In particular, 'where a public official's alleged retaliation is in the nature of speech, in the absence of threat, coercion, or intimidation intimating that punishment, sanction or adverse regulatory action will imminently follow, such speech does not adversely affect a citizen's First Amendment rights.'" *Villagrana*, 2005 WL 2322808 at *3 (quoting *Suarez*, 202 F.3d at 687) (collecting cases); *see also X-Men Sec., Inc. v. Pataki*, 196 F.3d 56 (2d Cir. 1999) (holding that, in the absence of threats, intimidation, or coercion, legislators' "disparaging, accusatory, or untrue statements about X-Men fail to state a claim for violation of X-Men's constitutional rights"); *Chicago Reader v. Sheahan*, 141 F. Supp. 2d 1142, 1145 (N.D. Ill. 2001) (noting that "a public official cannot be held liable for exercising his own free speech rights" if the speech is not "threatening or harassing").

Turning to the facts of this case, I am not persuaded that D'Amato's statements could reasonably be interpreted as intimating that D'Amato would punish, sanction, or take an adverse governmental action against the Bondars. *Suarez*, 202 F.3d at 687. To be sure, D'Amato's comments do not portray the Bondars in a positive light. However, D'Amato's comments do not assert, or even imply, that he would utilize his governmental power to attempt to silence the Bondars. And, as previously noted, while such comments may have been accusatory, disparaging, or even untrue, I am satisfied that D'Amato's comments cannot be reasonably construed as "threatening or harassing." *Chicago Reader*, 141 F. Supp. 2d at 1145. As the court explained in *Suarez*, "[t]he requirement that public official's speech include a threat, coercion, or intimidation, to adversely affect a citizen's First Amendment rights recognizes that a balance must be struck between the citizen's rights and the public official's personal First Amendment rights." 202 F.3d at 687 n.13; *see also Thoma v. Hickel*, 947 P.2d 816, 821 (Alaska 1997) (concluding that "[w]e do not believe that

14

imposing section 1983 liability on a public official who responds in kind to protected speech critical of the official would be consistent with the First Amendment")

Simply put, to accept the plaintiff's argument would "suggest a rule that would preclude an individual accused of wrongdoing from speaking out on his or her own defense if doing so would cast the accuser in a less than positive light." *Owens v. Ragland*, 131 F. Supp. 2d 939, 948 (W.D. Wis. 2004). Indeed, in that same article in which D'Amato's comments appeared, Brian Delfosse, one of the Bondars' allies in their fight against the Overlay Project, referred to the new EVA board as "doing [D'Amato's] dirty work." (M. Bondar Aff., Ex. B.) And, in the same article, Bernie Bondar accused D'Amato and the proponents of the Overlay Project of being involved in a "conspiracy" to "fix" the EVA Board's November of 2004 election. (M. Bondar Aff., Ex. B.) That said, I am persuaded that D'Amato's comments were not sufficiently adverse to give rise to a violation of the First Amendment. And, even assuming that such comments did give rise to a violation of the First Amendment, I cannot say that it would be clear to a reasonable public official that such conduct was unlawful in the situation that D'Amato confronted. *Saucier*, 533 U.S. at 202.

## B. Removing the Sign from the Tree

The plaintiffs allege that D'Amato removed a sign from Jill Bondar's property that read, "No! Overlay District!!! Ald. D'Amato" in retaliation against the Bondars for their speech in opposition to the Overlay District Project. Specifically, the Bondars allege that the sign, which was posted to a tree planted within the area between the sidewalk and the street, was protected speech. The plaintiffs argue that Jill Bondar paid taxes on the land between the sidewalk and the street and thus, the sign was located on private property, not public property. In response, the defendant asserts that because the sign was posted on a tree planted in the "tree border," that is, the grassy area between

15

the sidewalk and the street, the sign was posted on city-owned property. And, according to the defendant, because the sign was illegally posted to a city-owned tree in violation of Milwaukee Ordinance § 244-18-1, it does not constitute protected speech. The defendant further argues that because the speech was not protected, D'Amato did not violate the Bondars' First Amendment rights when he directed his assistant to remove the sign from the tree.

City of Milwaukee Ordinance § 244-18-1, entitled Temporary Banners and Other Nonrigid Signs: Signs on Public Property Prohibited, provides in pertinent part that:

> It shall be unlawful for any person, except a public officer or a government employee in the performance of a public duty, to maintain, place, erect, paint, past, print, nail, tack, or otherwise fasten any . . . sign, poster, advertising, or notice of any kind, or cause the same to be done, on any curb, streetwalk, or *public thoroughfare* surface, fence, board, barrel, box, case, railing, pole, post, *tree* . . . or structure of any kind on public ground . . . within the city, except as may be permitted by this chapter or any provision of the Milwaukee code, the Milwaukee charter, Wis. Stats., or federal laws.

Mil. Ord. § 244-18-1 (emphasis added). It is undisputed that the tree to which the sign was posted was located within the "tree border," that is, the grassy area between the sidewalk and the street, in front of Jill Bondar's residence in the City of Milwaukee. Thus, the question is whether the tree at issue in this case constitutes a "public thoroughfare tree" or a "structure of any kind" on public ground. In my opinion, it does.

Section 11-03 of the City of Milwaukee Charter, entitled "Tree Borders," provides that "[t]hat portion of the *street* lying between the curb and the sidewalk, also known as the tree border, of any premises or property in the city of Milwaukee fronting on a street, the grade of which shall have been established, shall be leveled with the grade and seeded." City of Milwaukee Charter § 11-03 (emphasis added). Additionally, section 115-1-15 of the City of Milwaukee Code of Ordinances provides that the "sidewalk area" is "that portion of the street located between the street lot line and

16

the roadway. Where there are curbs, it shall be that portion of the street between the lot line and the face of the curb." Mil. Ord. § 115-1-15. And, the "tree border" is the part of the sidewalk area "located between the curb and the outside line of the sidewalk closest to the curb." Mil. Ord. § 115-24-1. Such being the case, the tree border section of the sidewalk area is part of the public right-of-way. *See* Ltr. from City of Milwaukee Dep't of Public Works, File Number 031168 *available at* http://legistar.milwaukee.gov/attachments/20582.doc. Milwaukee Ordinance § 10-04 also provides that:

> the commissioner of public works may plant, transplant, remove, trim, spray, and otherwise care for, and protect all trees and shrubs, on or in that part of any street, the grade of which has been established, lying between the lot line and the curb, or in the center and side plots in all boulevards and parkways . . . the cost of planting . . . and maintaining any such trees or shrubs between the lot line and the curb in front of any lot or parcel of land abutting on a street . . . shall not be chargeable to or assessed upon such lot or parcel of land, unless otherwise ordered by the common council.

Mil. Ord. §§ 10-04-2; 10-04-3.

Simply put, in light of the foregoing, I am satisfied that the tree upon which Jill Bondar's sign was posted was a tree located on a public thoroughfare. Consequently, the sign was posted in violation of City of Milwaukee Ordinance § 244-18-1, and as such, the sign was not protected speech. To be sure, the plaintiffs argue that Jill Bondar pays taxes on the land constituting the "tree border." (Pl.'s Br. at 5.) Yet, the plaintiffs have not provided any evidence to support such an assertion. And, given that the City's Code of Ordinances provides that the tree border is part of the public right-of-way, even assuming Jill Bondar's lot line extends to the middle of the street, it is highly unlikely that she is actually paying property taxes on part of the public right-of-way. The plaintiffs further argue that Jill Bondar plants the flowers surrounding the tree upon which she posted the sign, and thus, the tree constitutes private property. However, as the City of Milwaukee Charter

17

and its ordinances indicate, although that section of a property commonly referred to as the "tree border" is to be maintained by the owner of the abutting property, that does not change the fact that the property is in fact owned by the City of Milwaukee and is part of the public right-of-way. *See* City of Mil. Charter § 11-03 (stating that the tree border shall be leveled with the grade and seeded by the abutting property owner); *see also* City of Mil. Ord. § 115-24-1 (stating that an abutting property owner cannot "fill" the "tree border" with something other than grass without first obtaining permission to do so from the Commissioner of the City of Milwaukee's Department of Public Works). In the end, given that the sign was posted to a tree located on a public thoroughfare, it was indeed posted in violation of City of Milwaukee Ordinance § 244-18-1, and thus, the sign itself was not protected speech.

Reaching this conclusion, however, does not end the court's inquiry as to whether D'Amato is entitled to qualified immunity on the plaintiffs' claim that he violated their First Amendment rights when he directed his assistant to remove the sign. This is because, despite the fact that the sign did not constitute protected speech, it is undisputed that the Bondars did engage in protected speech when they spoke out at public meetings in opposition to the Overlay Project. And, although their claim was rather inartfully plead, the plaintiffs do allege that, because they engaged in such protected speech, D'Amato selectively and discriminatorily enforced the sign ordinance against them and not against others who were also violating such ordinance. (Pl.'s Br. at 6.) Indeed, the plaintiffs allege a First Amendment retaliation claim based upon selective enforcement of the sign ordinance; that is, they allege that, in retaliation for their engaging in protected speech against the Overlay Project, D'Amato enforced the sign ordinance against the Bondars and did not enforce such ordinance against others who were similarly situated.

18

In *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984), the Supreme Court held that a City of Los Angeles Ordinance prohibiting the posting of any signs on public property was not unconstitutional as applied to the expressive activities of a group of supporters of a particular political candidate who had posted signs supporting their candidate on utility poles and other public property. 466 U.S. at 815. In so doing, the Supreme Court relied upon the fact that the ordinance was viewpoint neutral and also that there was no hint of bias or censorship in the City's enforcement of the ordinance.

> The general principle that has emerged from this line of cases is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others. That general rule has no application to this case. For there is not even a hint of bias or censorship in the City's enactment or enforcement of this ordinance. There is no claim that the ordinance was designed to suppress certain ideas that the City finds distasteful or that it has been applied to appellees because of the views that they express. The text of the ordinance is neutral-indeed it is silent-concerning any speaker's point of view, and the District Court's findings indicate that it has been applied to appellees and others in an evenhanded manner.

*Id.* at 804 (citations omitted).

In *Taxpayers for Vincent*, the plaintiffs brought an "as applied" challenge to the sign ordinance itself. Specifically, the plaintiffs argued that the ordinance was unconstitutional as it was being applied to supporters of political candidates. Here, the Bondars have not challenged the constitutionality of the sign ordinance. Nor have they alleged that the sign ordinance was unconstitutional as applied to them and other supporters of their political position. Simply put, in *Taxpayers for Vincent*, the Court was addressing the constitutionality of the ordinance rather than a claim that a public official was selectively enforcing such an ordinance in retaliation against those speaking out against his policies. Nevertheless, in my opinion, *Taxpayers for Vincent* is still

19

applicable to the case at hand. This is because in *Taxpayers for Vincent* the Court made clear that public officials cannot enforce a viewpoint neutral ordinance in such a way as to engage in viewpoint discrimination; that is, enforce such an ordinance in a biased manner and against certain individuals because of the views they express. Indeed, it is well-established that the government "may not selectively enforce [its] laws in ways that violate other rules, such as the prohibition of racial discrimination, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), or the first amendment–[the government] could not, for example, [enforce a law in a way that benefits] Republicans but not Democrats." *Archie v. City of Racine*, 847 F.2d 1211, 1218 n.7 (7th Cir. 1988).

Furthermore, it is well-established that a public official cannot engage in the selective enforcement of a law or ordinance in retaliation for an individual's exercise of his First Amendment rights. *See Wayte v. United States*, 470 U.S. 598, 614 (1985) (holding that defendant can be prosecuted in spite of speech, but not because of it); *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 497 (1999) (Ginsburg, J., concurring) ("Under our selective [enforcement] doctrine, 'the decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or arbitrary classification, including the exercise of protected statutory and constitutional rights.") (internal quotations omitted). Indeed, "[j]ust as it is obvious that application of a facially neutral law may violate the equal protection clause, *see Yick Wo v. Hopkins*, 118 U.S. 356 (1886), so too may the application of a facially neutral law so as to discriminate against certain speakers or ideas violate the First Amendment." *Field Day, LLC v. Suffolk*, 463 F.3d 167, 193 (2006).

To reiterate, the plaintiffs allege that D'Amato selectively and discriminatorily enforced Ordinance § 244-18-1 against them because of their protected speech and in an effort to "chill" their

20

First Amendment rights to speak out on issues of public concern. That said, assuming the truth of the plaintiffs' allegations, I am persuaded that it would be obvious to a reasonable public official that it would be unlawful to enforce Ordinance § 244-18-1 selectively against certain individuals in retaliation for their having exercised their constitutional rights to speak on issues of public concern and not enforce the ordinance against other similarly situated "violators" of the ordinance. Consequently, D'Amato is not entitled to qualified immunity on the plaintiffs' claim that he violated their First Amendment rights when he directed his assistant to tear down the sign that was posted upon the tree in front of Jill Bondar's property.

The court notes that, in support of his motion for summary judgment based upon qualified immunity, D'Amato asserts that he was enforcing the ordinance in an evenhanded manner. He also asserts that he had previously directed removal of other illegally posted signs. (Def.'s Br. at 10.) However, as previously stated, when determining whether a public official is entitled to qualified immunity I must assume the truth of the plaintiffs' allegations. The defendant also argues that there is no evidence that D'Amato singled out Ms. Bondar or any other person in sign removal. (Def.'s Reply Br. at 6.) This argument, however, goes to the merits of the plaintiffs' claim, and it would be inappropriate for the court to address the merits of this claim at this time. This is because the court has stayed discovery, specifically the plaintiffs' request to depose Alderman D'Amato, pending the outcome of the defendant's motion for summary judgment on the basis of qualified immunity. Indeed, after the plaintiffs take relevant discovery, this court may very well be called upon to address the merits of this claim via another motion for summary judgment.

There is one additional matter to address with respect to this claim. The plaintiffs also allege that, after directing his assistant to take down the sign at issue in this case, D'Amato telephoned Jill

21

Bondar and left her an allegedly threatening message. According to the plaintiff's complaint, in that message D'Amato stated that "those involved in posting the opposition signs in the neighborhood would receive citations." (Compl. at ¶ 24). According to Jill Bondar's affidavit,

> in that message D'Amato stated that he received a call from someone telling him that I could help him find out who posted the "No Overlay District" sign "illegally" on the trees in the public way, on the grass between the sidewalk and the street. He told me that I should have known that violated an ordinance. He further told me that several neighbors had complained so people were sent to remove the signs. He stated that he personally observed one sign and removed it. He told me that the Department of Public Works and the Police were wondering if I had any information about who posted the sign so the police could give that person a ticket. He left his phone number and told me that if I called him, he would put me in touch with the proper authorities.

(J. Bondar Aff. ¶ 14.) And, according to D'Amato,

> Within a few days of the sign being removed, I learned that the sign had been placed in front of Jill Bondar's home on a City-owned tree, and I telephoned the plaintiff, Jill Bondar, and left a message on her answering machine indicating that: a) I was aware that she was an employee of the City of Milwaukee Department of Public Works; b) given her position she should have known that City law prohibits placing a sign on a City-owned tree; c) if she had any information concerning who had placed the sign on the tree, she should provide it to me; and d) that the sign would be returned to whomever had placed it on the tree as I had kept it.

(D'Amato Aff. ¶ 12.)

To reiterate, the standard in determining qualified immunity is as follows: taking the facts in the light most favorable to the party asserting the injury, whether the facts alleged show the defendant's conduct violated a clearly established constitutional right. *Saucier*, 533 U.S. at 201. Or, in other words, "assuming the truth of the plaintiff's allegations, [did] the official's conduct violate clearly established law"? *Crawford El*, 523 U.S. at 597-98. The defendant appears to argue that in determining whether he is entitled to qualified immunity the court should assume that his version of the message, rather than the plaintiffs' version of the message, is true. Ironically, the defendant's

version of the telephone message is arguably more "threatening" that the plaintiffs version. Be that as it may, after analyzing both versions of the telephone message, I am persuaded that, under either version, D'Amato's comments do not give rise to actionable retaliation. This is because, as previously stated, "'where a public official's alleged retaliation is in the nature of speech, in the absence of threat, coercion, or intimidation intimating that punishment, sanction or adverse regulatory action will imminently follow, such speech does not adversely affect a citizen's First Amendment rights.'" *Villagrana*, 2005 WL 2322808 at *3 (quoting *Suarez*, 202 F.3d at 687).

And, I am satisfied that D'Amato's comments cannot be reasonably construed as "threatening or harassing" or intimating that punishment, sanction, or adverse regulatory action will imminently follow. *Chicago Reader*, 141 F. Supp. 2d at 1145. Nor can I say, even assuming that such comments did give rise to a violation of the First Amendment, that it would be clear to a reasonable public official that such conduct was unlawful in the situation D'Amato confronted. *Saucier*, 533 U.S. at 202. Indeed, the plaintiffs have not directed the court's attention to a "closely analogous" case that would have led a reasonable public official in D'Amato's position to realize that such comments in a voicemail message would give rise to a violation of Jill Bondar's First Amendment rights; nor has the court been able to find such a case. Consequently, to the extent that the plaintiffs are alleging that D'Amato's telephone message itself constituted actionable retaliation, D'Amato is entitled to qualified immunity on such a claim.[3]

_____

[3] That is not to say, however, that the plaintiffs cannot use the evidence of D'Amato's message left for Jill Bondar as evidence in support of their claim that they were selectively targeted for enforcement of the ordinance based upon their engaging in protected speech against the Overlay Project.

23

*C. Referral of Wolski's to Licensing Committee*

The plaintiffs allege that in retaliation against them for their speech in opposition to the Overlay Project, D'Amato referred their tavern, Wolski's, to the Utilities and Licenses Committee of the Common Council of the City of Milwaukee. In response, D'Amato asserts that his conduct in referring Wolski's to the licensing committee does not constitute actionable retaliation. Furthermore, even assuming such conduct does constitute actionable retaliation, that is, assuming that D'Amato was motivated at least in part by the Bondars' protected speech when he referred Wolski's to the licensing committee, a reasonable official in his position would not have known that such conduct was clearly unconstitutional.

As set forth above, the parties do not dispute the following facts:

D'Amato received a complaint from a constituent indicating that her tenant had telephoned her and reported broken bottles smashed on the stoop in front of her building, and such building is located close to Wolski's. (DPFOF ¶ 18.) Among the debris found on her property, the property owner had found "I Closed Wolski's" bumper stickers, and thus, the constituent concluded that the broken bottles and other debris were left by Wolski's patrons. (DPFOF ¶ 19.) At the time of having received the e-mail complaint, D'Amato was aware that the customary practice of the City of Milwaukee Common Council Committee on Utilities and Licenses was to schedule a hearing to review the renewal of any tavern license once the City had received a formal, written neighbor complaint, as occurred with the e-mail that D'Amato had received. (DPFOF ¶ 23.) And, the plaintiffs do not dispute that this was the customary practice. In response to this citizen complaint, D'Amato requested that the Licenses Committee of the Common Council of the City of Milwaukee conduct a hearing on the request for the renewal of a license for Wolski's tavern. (DPFOF ¶ 24.)

24

At all times pertinent to this lawsuit, D'Amato was not a member of the Common Council

Committee on Utilities and Licenses. (DPFOF ¶ 27.) At the hearing conducted by the Committee

on this renewal, Alderman D'Amato made the following statement to the Committee:

> I had met with Mr. Bernie Bondar on Friday and told him that we received one
> complaint that we sent to the License Division, and as you know, when we receive
> a neighborhood complaint, we do schedule places that are up for normal renewal. We
> received three complaints in which people asked their names be withheld. They were
> from various areas around the bar within a couple of blocks, and we did receive one
> police complaint about a car leaving the tavern at closing time in which the person
> ran into a house at 1818 North Pulaski Street, and that person was cited for drunk
> driving, so there were some concerns.
>
> I have representing this area for nine years, have not had complaints about Wolski's.
> The occasional complaint I think early on about closing time, but the gentlemen have
> always been responsible in making sure that the neighbors be respectable to the
> neighborhood, and we would just ask that they continue to do that in this area and that
> the neighbors would appreciate it.

(DPFOF ¶ 30.) At the hearing, Alderman D'Amato made no further statements, and in particular,

made no recommendations with regard to any action on the license. (DPFOF ¶ 31.) The Utilities

and Licenses Committee of the City of Milwaukee Common Council unanimously recommended

renewal of the Wolski's license. (DPFOF ¶ 32.) The renewal of Wolski's license also passed the

full Common Council unanimously, and Alderman D'Amato did not object to the renewal. (DPFOF

¶ 33.) According to Mike Bondar, in all the 33 years he and his brother were involved in managing

the bar, this was the only time that they were called upon to defend the bar's license. (PPFOF ¶ 30.)

With respect to this claim, the plaintiffs do not allege that D'Amato "selectively and

discriminatorily" referred their tavern to the licensing board based upon a neighbor's complaint while

refusing to refer other "similarly situated" taverns to the licensing board, i.e., other taverns that had

received complaints from neighbors but whose owners had not spoken out against policies that

D'Amato favored. Nor do the plaintiffs dispute that it was the customary practice of the City of Milwaukee Common Council Committee on Utilities and Licenses to schedule a hearing to review the renewal of any tavern license once the City had received a formal, written neighbor complaint. (DPFOF ¶ 23; Pl.'s Resp. to DPFOF ¶ 23.) Nor do the plaintiffs allege or argue that the complaint upon which D'Amato relied, at least in part, was fabricated or false.

Distilled to its essence, the plaintiffs' argument appears to be that, even though the receipt of a neighbor's written complaint about a bar is a valid reason to refer a bar to the licensing committee, D'Amato's reliance on the neighbor's complaint, that is, a legitimate reason, in this instance was merely a pretext for his real reason for referring the bar to the committee: to retaliate against the Bondars for their speech against the Overlay Project. Yet, the Bondars do not allege, nor could they, that D'Amato's conduct at the licensing committee hearing was retaliatory. This is because D'Amato did not make any negative comments at the hearing about either the Bondars or Wolski's and at no point in time did D'Amato recommend that either the committee or the common council disapprove Wolski's application for renewal of its liquor license. In short, the sole claimed retaliatory act at issue in this case is D'Amato's referral of Wolski's to the licensing committee. And, as noted above, it is undisputed that while D'Amato may have been motivated at least in part by the Bondars' speech when he referred Wolski's to the licensing committee, he also had a legitimate reason for doing so, that is, the neighbor's complaint.

To be sure, it may have been a violation of the Bondars' First Amendment rights if D'Amato had referred Wolski's to the licensing committee *solely* based upon their protected speech. That, however, is not the question before the court. Rather, given that D'Amato also had a legitimate reason to refer Wolski's to the licensing committee, the question before the court is: assuming that

26

D'Amato was motivated at least in part by the Bondars' speech when he referred Wolski's to the licensing committee, does the fact that D'Amato also had a legitimate reason to refer Wolski's to the committee, i.e., the neighbor's complaint, provide D'Amato a complete defense to the Bondars' First Amendment retaliation claim?

In my opinion, the Seventh Circuit would be inclined to find that D'Amato's legitimate reason to refer Wolski's to the licensing committee does provide a complete defense to the Bondars' retaliation claim, and thus, D'Amato did not violate the Bondars' First Amendment rights when he referred Wolski's to the licensing committee. This is because in the analogous context of a First Amendment retaliation claim based upon an arrest, the Seventh Circuit has suggested that it would be inclined to find the existence of probable cause to arrest to be a complete defense to the First Amendment retaliation claim. *Abrams v. Walker*, 307 F.3d 650, 657 (7th Cir. 2002), *overruled on other grounds by Spiegla v. Hull*, 371 F.3d 928, 941 (7th Cir. 2004). In *Abrams*, the Seventh Circuit declined to specifically address the issue. However, the court stated that such a holding "would not be incongruent with [the Seventh Circuit's] recent decision in *Williams v. Jaglowski*, 269 F.3d 778, 781 (7th Cir. 2001), in which [the court] held that probable cause is a complete defense to false arrest claims brought under the Fourth Amendment."[4] *Id.* Thus, the Seventh Circuit has, at the very least, insinuated that where a legitimate reason for engaging in the allegedly retaliatory action exists, for example the existence of probable cause in a First Amendment retaliation claim based upon an arrest, such legitimate reason would be a complete defense to the retaliation claim.

---

[4] The court notes that there is currently a circuit split on whether the existence of probable cause to prosecute is a complete defense to a First Amendment retaliation claim based upon retaliatory prosecution. *See Izen v. Catalina*, 398 F.3d 363, 368 n.7 (5th Cir. 2005) *cert. denied* 126 S.Ct. 1908 (2006) (noting the circuit split and holding that probable cause is a complete defense).

And, although a First Amendment retaliation claim based upon an arrest is analogous to the case at hand, it is also distinguishable from the case at hand. This is because the arrest of an individual is a significantly more adverse action for a government official to engage in than the referral of a tavern to a licensing committee. Thus, the arrest of an individual is much more likely to "chill" the individual's exercise of his or her constitutional rights than the referral of one's business to a licensing committee.

Furthermore, in my opinion, to conclude that the existence of a legitimate reason to refer a business to a licensing committee is not a complete defense to a First Amendment retaliation claim would effectively "handcuff" an alderperson simply trying to do his or her job. After all, it is not uncommon for business owners in the City of Milwaukee to speak out against policies proposed by alderpersons or the City of Milwaukee Common Council. Because part of an alderperson's job is to respond to constituent complaints about certain businesses and refer such businesses to the appropriate committees, an alderperson is referring such businesses to the appropriate committees on a regular basis. It would put an alderperson in an impossible "Catch 22" situation if he or she receives a complaint about a business whose owners have spoken out against one of the policies he or she proposed. This is because the alderperson would be faced with the choice of either referring such business to the appropriate committee and risk being sued for First Amendment retaliation, or not referring the business to the committee despite the constituent's complaint and risk being removed from office for not effectively responding to his or her constituents.

In sum, for all of the foregoing reasons, it is my opinion that the Seventh Circuit would likely find that the existence of the neighbor's complaint (and thus, a legitimate reason for D'Amato to refer Wolski's to the licensing committee) would defeat the Bondars' retaliation claim.

28

Yet, even assuming D'Amato violated the Bondars' First Amendment rights by referring their bar to the licensing committee based upon, at least in part, their protected speech, I am not persuaded that it was "apparent" from pre-existing law that such an action was unlawful.[5] *Anderson*, 483 U.S. at 640. "The law is clearly established if various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand." *Driebel v. City of Milwaukee*, 298 F.3d 622, 651 (7th Cir. 2002) (internal quotations omitted). Here, the plaintiffs assert that *Reed v. Village of Shorewood*, 704 F.2d 943 (7th Cir. 1983) and *Copsy v. Swearingen*, 36 F.3d 1336 (5th Cir. 1994) are closely analogous cases from which it would be "apparent" that D'Amato's conduct was unconstitutional.

In *Reed*, the plaintiffs, owners of a local tavern, alleged that the defendants "interfered with and eventually destroyed their business," and that the reason for the defendants' doing so was their "animosity to the fact that the live entertainment in the [plaintiffs'] bar was provided by a rock and roll band." 704 F.2d at 947-48. The plaintiffs alleged that in 1979, "the defendants began to harass the plaintiffs-arresting customers and employees on baseless charges, demanding proof of age from customers who obviously were many years over the legal drinking age, and bringing groundless proceedings to take away their Class A license." *Id.* The district court dismissed the complaint, holding, *inter alia*, that "while the plaintiffs may have had a First Amendment right to play rock and roll music they had no constitutional right to sell liquor at the same time." *Id.* at 948. The Seventh Circuit Court of Appeals reversed, holding that there were issues of material fact that precluded

---

[5] Indeed, the mere fact that this court could not find a similar case to the case at hand, and therefore, had to analogize the issue in the case at hand to a similar issue that the Seventh Circuit has addressed, reveals that it would have not been clear to a reasonable official that the conduct engaged in was unconstitutional.

29

summary judgment on the plaintiffs' claims that their constitutional rights were violated. It is unclear whether the plaintiffs proved these allegations on remand, and thus, there is no decision holding that particular acts constitute retaliation in violation of the First Amendment.

In *Copsey*, the plaintiff, who is blind, received a license to operate a vending facility in the Louisiana state capitol building through a program operated by the Louisiana Division of Blind Services. 36 F.3d at 1338. The plaintiff became convinced that state officials were permitting another organization to operate another vending facility in the state capitol building allegedly in violation of the program, and publicly aired his grievances regarding the alleged violation. After airing his grievances publicly, the plaintiff's license was terminated. Although he was eventually reinstated and compensated for his loss, the plaintiff brought suit under § 1983 alleging that his license was revoked in retaliation for his exercise of his First Amendment rights. A jury trial was commenced on the First Amendment retaliation claim, but at the close of the plaintiff's case, the district court granted the defendant's motion for a directed verdict. On appeal, the Fifth Circuit Court of Appeals held that there was "sufficient evidence from which a fact-finder could conclude that the defendant terminated Copsey's license because of Copsey's speech which addressed matters of public concern, and would not have done so but for such protected speech." *Id.* at 1346. The Fifth Circuit also held that the district court erred in awarding qualified immunity to the defendant because, a reasonable officer . . . would have to know that revoking a blind vendor's license in retaliation for such publicly-aired complaints violated the First Amendment." *Id.*

The facts in both of these cases are distinguishable in a fair way from the facts presented in the case at hand. *Driebel*, 298 F.3d at 651. Indeed, D'Amato did not engage in any conduct approaching the level of conduct alleged by the plaintiffs in *Reed*; that is, he neither harassed

30

Wolski's customers or employees, nor did he revoke Wolski's liquor license numerous times based upon groundless charges. And, although the Fifth Circuit stated that a reasonable officer would have to know that he could not revoke a vendor's license in retaliation for his speech on issues of public concern, here D'Amato did not revoke the plaintiffs' liquor license. To be sure, he referred Wolski's to the licensing committee. However, at the hearing he did not speak negatively about the bar and did not even recommend nonrenewal of the license. Simply put, the plaintiffs have not cited, nor has the court found, a "closely analogous" case upon which the court could conclude that it was "apparent" from pre-existing case law that the conduct in which D'Amato engaged was unconstitutional.

In short, even assuming this conduct violated the Bondars' First Amendment rights, I cannot say that it was clearly established at the time D'Amato engaged in such conduct that it was illegal. Indeed, the relevant question is not whether D'Amato's actions were expressly authorized by existing law, but rather, "whether they were clearly *forbidden*-i.e., whether a reasonable official would have known the actions in question were illegal." *Wernsing v. Thompson*, 432 F.3d 732, 749 (7th Cir. 2005) (emphasis in original) (quotations omitted). And, "[i]n the absence of a case factually similar to the one at bar, an official is entitled to qualified immunity unless the alleged misconduct constitutes an obvious violation of a constitutional right." *Id.* This is because "[p]ublic officials need not predict, at their financial peril, how constitutional uncertainties will be resolved." *Hosty v. Carter*, 412 F.3d 731, 739 (7th Cir. 2005). In sum, the court concludes that, with respect to the Bondars' claim that D'Amato violated their First Amendment rights when he referred Wolski's to the licensing committee, D'Amato is entitled to qualified immunity.

31

*D. Pattern of Petty Harassment*

The plaintiffs also allege that D'Amato engaged in a campaign of petty harassment of the Bondars, which included the sign removal incident, D'Amato's referral of Wolski's to the licensing committee, as well as D'Amato's public remarks criticizing the Bondars in a local newspaper. In support of this claim, the plaintiffs rely primarily upon *Pieczynski v. Duffy*, 875 F.2d 1331 (7th Cir. 1989).

In *Pieczynski*, the Seventh Circuit held that the petty harassment of a public employee for his political beliefs violates the First Amendment unless the harassment is so trivial that a person of ordinary firmness would not be deterred from holding or expressing those beliefs. *Id.* at 1333. Specifically, in *Pieczynski*, the Seventh Circuit held that the following actions constituted a campaign of petty harassment such that the jury's verdict was upheld: (1) the plaintiff's supervisor requested disciplinary action be taken against the plaintiff because she parked in an unauthorized spot, (2) the plaintiff's supervisor accused plaintiff of taking a bribe when she accepted a gift of a cordless phone, (3) the plaintiff's supervisor took away the plaintiff's supervisory duties and assigned her nothing but monotonous paper work, and (4) the plaintiff's supervisor called her a liar and denied her requests for vacation time. *Id.* at 1335. In *Pieczynski*, the court also held that the defendant was not entitled to qualified immunity because the "principle that a campaign of petty harassments can violate the First Amendment (unless *de minimus*) was clearly stated in [*Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982)], and should have placed these defendants on notice that false accusations and petty humiliations, if orchestrated into a campaign of political retaliation, are actionable." *Id.*

Even assuming that D'Amato's conduct did give rise to a campaign of "petty harassment" that violated the Bondars' First Amendment rights, I cannot say that it would have been clear to a

Case 2:06-cv-00109-WEC   Filed 06/11/07   Page 32 of 34   Document 55

reasonable public official in the situation D'Amato confronted that such conduct was unconstitutional. *Saucier*, 533 U.S. at 202. To be sure, the plaintiffs have directed the court's attention to *Pieczynski* and *Bart v. Telford*. However, those cases are factually distinguishable from the case at bar as those cases both involved a campaign of "petty harassment" in the context of a public employment relationship. Although the Bondars need not offer up a federal decision which precisely mirrors the facts of this case, at a minimum they must point to a closely analogous case decided prior to the challenged conduct. *Sonnleitner v. York*, 304 F.3d 704 (7th Cir. 2002). Once again, the plaintiffs have not directed the court to any "closely analogous" case that would have led a reasonable public official in D'Amato's position to realize that engaging in such conduct would give rise to a "campaign of petty harassment" that would violate the Bondars' First Amendment rights. Nor has this court been able to find such a case.

Indeed, "given the circumstances of the incident at issue in the [this] case, it would be difficult to charge [D'Amato] with notice of a clearly established constitutional right based on the . . . pronouncement [in *Pieczynski*], a case arising under completely different facts." *Lunini v. Grayeb*, 395 F.3d 761 (7th Cir. 2005). Consequently, to the extent that the plaintiffs are alleging that D'Amato engaged in a campaign of petty harassment against the Bondars and such conduct constituted actionable retaliation, D'Amato is entitled to qualified immunity on such a claim.

**NOW THEREFORE IT IS ORDERED** that the defendant's motion for summary judgment based upon qualified immunity be and hereby is **GRANTED IN PART** and **DENIED IN PART**;

**IT IS FURTHER ORDERED** that defendant D'Amato is not entitled to qualified immunity with respect to the plaintiffs' claim that he violated their First Amendment rights when he directed his assistant to tear down the sign that was posted upon the tree in front of Jill Bondar's property;

33

IT IS FURTHER ORDERED that defendant D'Amato is entitled to qualified immunity with respect to the remainder of the plaintiffs' claims;

IT IS FURTHER ORDERED that on Monday, June 25, 2007 at 9:00 a.m. in Room 253 of the United States Courthouse, 517 E. Wisconsin Ave., Milwaukee, Wisconsin, a scheduling conference will be conducted to discuss with the parties the further processing of this case to final resolution.

SO ORDERED this <u>11th</u> day of June 2007, at Milwaukee, Wisconsin.


/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge