UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BERNIE BONDAR, DENNIS BONDAR,
JILL BONDAR, and MIKE BONDAR,

      Plaintiffs,

  v.                                         Case No. 06-C-109

MICHAEL D'AMATO (in his individual capacity),

      Defendant.

**DECISION AND ORDER ON DEFENDANT'S RENEWED
MOTION FOR SUMMARY JUDGMENT**

## I. PROCEDURAL BACKGROUND

This action was commenced on January 23, 2006, when the plaintiffs, Bernie Bondar, Dennis Bondar, Jill Bondar, and Mike Bondar ("the Bondars"), filed a complaint in the United States District Court for the Eastern District of Wisconsin alleging that they were retaliated against for exercising their First Amendment rights in violation of 42 U.S.C. § 1983. In their complaint, the Bondars alleged that Michael D'Amato ("D'Amato") engaged in the following actions in retaliation against them because of their speech in opposition to the Overlay District Project, a project which D'Amato, who is a City of Milwaukee alderman, favored: (1) D'Amato removed a sign that advocated opposition to the Overlay District Project that was posted by Jill Bondar; (2) D'Amato referred the Bondars' tavern, Wolski's, to the City of Milwaukee's Utilities and Licensing Committee; and (3) D'Amato engaged in a campaign of petty harassment of the Bondars, which included the sign removal incident, D'Amato's referral of Wolski's to the licensing committee, as well as D'Amato's public remarks criticizing the Bondars in a local newspaper.

Previously, in a decision and order issued on June 11, 2007, the court granted in part and denied in part the defendant's motion for summary judgment. Specifically, on the grounds of qualified immunity, the court dismissed all of the plaintiffs' claims, except for their claim that D'Amato violated the plaintiffs' First Amendment rights when he directed his assistant to tear down a sign that advocated opposition to the Overlay District Project that was posted by Jill Bondar on the tree in front of her property. Although the court found that posting the sign was not protected speech (because it was posted in violation of a content-neutral ordinance), the plaintiffs could nevertheless proceed on the theory that the defendant violated their First Amendment rights by selectively enforcing the ordinance against them. As the court stated in its previous decision,

> [T]he plaintiffs allege a First Amendment retaliation claim based upon selective enforcement of the sign ordinance; that is, they allege that, in retaliation for their engaging in protected speech against the Overlay Project, D'Amato enforced the sign ordinance against the Bondars and did not enforce such ordinance against others who were similarly situated.

(Dec. and Order at 18.)

After the court issued its June 11, 2007 decision, a scheduling conference was conducted with the parties and the parties thereafter engaged in further discovery with respect to the remaining claim. On January 14, 2008, in accordance with the scheduling order, the defendant filed a renewed motion for summary judgment seeking dismissal of the plaintiffs' one remaining claim. That renewed motion for summary judgment is now fully briefed and is ready for resolution. For the reasons which follow, the defendant's motion for summary judgment will be granted.[1]

---

[1] There is no evidence that any plaintiff other than Jill Bondar placed the sign on the tree. It therefore follows that it is only plaintiff Jill Bondar's First Amendment rights that are yet in play in this lawsuit. Nevertheless, the court may refer to the plaintiffs in the plural throughout this decision.

2

## II. FACTUAL BACKGROUND

Accompanying the defendant's motion for summary judgment was a set of proposed findings of fact. The plaintiffs' materials filed in response to the defendant's motion included a response to those proposed findings as well as a set of additional proposed findings of fact. In turn, along with his materials in reply the defendant filed a response to those additional proposed findings. A review of the parties' respective proposed findings and the responses thereto demonstrate that the following (except where noted) are undisputed facts in this case.

The plaintiffs, Bernie Bondar, Dennis Bondar, Jill Bondar, and Michael Bondar, all live or do business in the City of Milwaukee.

The plaintiff, Jill Bondar, lives at 1227 East Kane Place, Milwaukee, Wisconsin and has lived there since about 1999. Ms. Bondar is a Crew Leader employed in the Milwaukee Department of Public Works. Ms. Bondar has worked for the City of Milwaukee since the year 2000.

At all times pertinent to this lawsuit, the defendant, Michael D'Amato, has been an Alderman in the City of Milwaukee representing the 3rd Aldermanic District. The 3rd Aldermanic District encompasses a portion of the City of Milwaukee that includes the area in which the plaintiffs reside or do business.

At all times pertinent to this lawsuit, the plaintiffs, Bernie, Michael and Dennis Bondar, were officers of a corporation that owned a tavern named Wolski's which is also located within the aldermanic district represented by the defendant, Michael D'Amato.

The plaintiffs have all either lived or done business in that part of Milwaukee for which there is a neighborhood association named the East Village Association (EVA) and the aforementioned tavern, Wolski's, is located within that area, as well.

In March 2004, the EVA was seeking to have special zoning rules applied to a portion of its neighborhood, referred to as the Overlay District Project. D'Amato publically supported the Overlay District Project. His office also created the Overlay District Project.

The Overlay District Project was to cover a 16 block area in the Bondars' neighborhood. It would have placed a higher level of zoning compliance on every property owner it covered. According to the plaintiffs, the Overlay District Project was supposedly designed to protect the historic nature of houses and buildings in the neighborhood, so any improvements or construction needed special approval, and had to be consistent with the stylistic rules that applied to the Overlay District Project. Again, according to the plaintiffs, the special style rules would have increased the costs of making changes to buildings within the Overlay District Project; these increased costs would have fallen especially hard on the poorest people in the community.

Also, according to the plaintiffs, the Overlay District Project rules would have prevented property owners from combining or dividing lots without special approval from the Department of City Development; these special regulations and rules subtracted from the value of all property within the Overlay District Project.

At some point, Alderman D'Amato became aware that the Bondars opposed the Overlay District Project. D'Amato knew that the Bondars were opposed to the Overlay District Project prior to September of 2004.

Ms. Bondar put up a sign approximately 20" wide by 10" high with white letters on a red background which read "No! Overlay District !!!! Alderman D'Amato." Ms. Bondar does not recall how long before September 2004 she placed that particular sign in the location near her house. The sign was placed on a tree. To the best of Ms. Bondar's knowledge, the City of Milwaukee planted

4

that tree after she had moved into her home, the trunk of the tree had approximately a 4" diameter, and Ms. Bondar placed the 20-inch wide sign on this tree, tying it in some fashion on the trunk.

According to the defendant, although Ms. Bondar had had contact with Alderman D'Amato prior to the time at which she placed the sign on the tree, she had never identified for him where she lived and she has no information from any source that he knew where she lived at the time that the sign was removed from the tree.

By contrast, the plaintiffs claim that, prior to early September of 2004, Jill Bondar testified during at least four meetings at which D'Amato was present, and that before giving any testimony, Jill Bondar provided her name and address.

In September 2004, while traveling in an automobile with his aide, Crystal Graf, now Crystal Hardinger, Alderman D'Amato noted that there was a sign opposing the Overlay District Project stapled to a City tree located in the City's tree border between the street and public sidewalk in front of a home. D'Amato considered the sign on the City tree to be obvious and egregious because there were many other signs like it in the neighborhood, all of them legally posted in home windows or yards, and this was the only sign in a public right-of-way attached to City property.

Alderman D'Amato had spoken in the past to owners of establishments like a tavern whose signs had been placed in the public right-of-way.

Alderman D'Amato was then aware that under Milwaukee ordinances, it was unlawful for a person to attach a sign to a City-owned tree.

Milwaukee Code of Ordinances § 244-18-1 makes it "Unlawful for any person, except a public officer or a government employee in the performance of a public duty, to maintain, place, erect, paint, paste, print, nail, tack or otherwise fasten any card, banner, picture, handbill, sign, poster, advertising, or notice of any kind, or cause the same to be done, on any post, tree, barricade, material,

5

bridge, bridge fender, dock, pile, building or structure of any kind on public ground, or public waterway, within the City . . ."

In the approximately eleven years that D'Amato has been an alderman, he has removed approximately 100 signs, including some that were placed on City trees prior to September 2004. Just a couple of weeks prior to his deposition, D'Amato took down a sign for Ron Paul for President that was attached to a City tree. That same week there was also a nightclub that had signs up and down Kenwood Boulevard on City trees and D'Amato removed some of those signs in front of the Zelazo Center near the University of Wisconsin-Milwaukee.

After noticing the sign attached to the tree (in front of Jill Bondar's house), and after some conversation, D'Amato asked his aide to remove the sign.

D'Amato recalls receiving a telephone call almost immediately thereafter from someone in the neighborhood who informed him that the sign was in front of Jill Bondar's house.

D'Amato cannot remember if he knew the sign was in front of Jill Bondar's house at the time it was removed, or if he merely learned that Jill Bondar knew who had placed the sign from a call he received after removing the sign.

D'Amato called Ms. Bondar. He did not speak personally with Ms. Bondar, but left a message with her. Alderman D'Amato's aide at that time, Crystal Graf, now Crystal Hardinger, witnessed D'Amato leave the telephone message for Jill Bondar.

According to the defendant, D'Amato called Ms. Bondar to let her know that as an employee of the Department of Public Works he thought she should know the ordinance which made it illegal to post a sign on City property and that if she knew whose house it was and whose sign it was that they could come to his office and retrieve it and post it properly.

According to the plaintiffs, after removing the sign in front of Jill Bondar's property, D'Amato called her about it. She was not home, so he left a message. In that message, D'Amato stated that he received a call from someone telling him that Jill could help him find out who posted the "No Overlay District" sign "illegally" on the trees in the public way, on the grass between the sidewalk and the street. He told Jill that she should have known that violated an ordinance. He further told her that several neighbors had complained, so people were sent to remove the signs. He stated that he personally observed one sign and removed it. He told Jill that the Department of Public Works and the Police were wondering if she had any information about who posted the sign so the police could give that person a ticket. He left his phone number and told Jill that if she called him, he would put her in touch with the proper authorities.

Crystal Hardinger does not recall whether at the time that she removed the sign that she knew where Jill Bondar lived or that she learned of her residence after the sign was removed. Hardinger does recall that she and the alderman were driving through the neighborhood, saw the sign was between the sidewalk and the street, and that that is why it was removed. Hardinger recalls the alderman saying that the sign was between the sidewalk and the street and that she should remove the sign. She recalls no mention of the Bondars before she removed the sign. Hardinger cannot recall another incident in which D'Amato specifically asked her to remove a sign as they were driving in a vehicle.

Hardinger can recall other incidents where the alderman and she had issues with signs. Hardinger can recall other instances where inappropriate signs had been placed in the UWM neighborhood where she had called the property owner and indicated to the owner that they needed to get rid of a sign and informed them that someone would be removing the sign.

7

Hardinger had witnessed D'Amato express his frustration regarding the manner in which the Bondars expressed their opposition to the Overlay District Project.

The plaintiff, Michael Bondar, previously submitted to the Court copies of photographs of certain signs located in the city tree border at two different locations. The photograph of the first location shows a number of political signs planted in a tree border area. Michael Bondar cannot say that he took this picture and cannot identify the location depicted in the first photograph. Michael Bondar did take the second picture, the owner of the property is Julilly Kohler, she had a construction company working at the location, and Michael Bondar cannot indicate who placed the signs shown in the picture at the location, whether it was done with city permission. The signs look like the type of official no-parking signs that the City posts on poles in tree borders. Michael Bondar had been to the location recently before his deposition, the signs were no longer there.

Michael Bondar has seen signs placed in tree borders that are present one day and gone the next.

D'Amato has not removed every sign that he sees and believes to be in violation of the sign ordinance because he believes that would be impossible. During his deposition, D'Amato identified three factors that prompt him to remove some signs but not others: (1) he may remove a sign if it's "convenient" while he's out walking; (2) he may remove a sign if there's a complaint from a constituent and he feels that he can handle the complaint "more easily, more quickly than referring [the complaint] to a city department"; and (3) he may remove a sign if [he] feels that the sign is "obvious and egregious."

One example of a sign that D'Amato removed because he found it to be "obvious and egregious" was a "Ron Paul for President" sign.

8

In September of 2004, D'Amato called in a number of presidential signs to the election committee for removal rather than remove them himself.

In October, 2005, D'Amato told a local newspaper that they (the Bondars) were willing to destroy anybody or anything to get their way; that they acted in narrow self interest; that they spread awful lies; that they were unneighborly; and that they did not contribute anything to the community.

### III. SUMMARY JUDGMENT STANDARDS

A district court must grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it

differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. Univ. of Wis.-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995)). "A mere scintilla of evidence in support of the nonmovant's position is insufficient." *Id.* (citing *Anderson*, 477 U.S. at 252).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## IV. DISCUSSION

As stated previously, there remains for resolution in this case only one claim: that D'Amato violated the plaintiffs' First Amendment rights when he selectively enforced the city ordinance by directing his aide to tear down a sign that advocated opposition to the Overlay District Project, which sign was posted by Jill Bondar on the tree in front of her home. The defendant's argument in support of his motion for summary judgment is predicated on two grounds: (1) the plaintiffs cannot establish

that speech by any of them was a substantial or motivating factor in D'Amato's enforcement of the City's ordinance governing postings in the public right-of-way; and (2) the plaintiffs have not produced evidence to show that D'Amato's removal of the sign on the tree in front of Jill Bondar's home constituted selective, or discriminatory, enforcement of the City's ordinance governing postings in the public right-of-way. Because resolution of the second ground is dispositive in this case, the court will address that ground first.

There is little question that the Bondars and D'Amato did not see eye to eye on the advisability of the Overlay District Project. Indeed, the newspaper articles which have been presented to the court make it abundantly clear that the parties seem to have gotten downright frustrated with, and nasty to, one another over the project. That they may have done so, however, goes nowhere in demonstrating that, in September 2004, when D'Amato instructed his aide to remove the sign from the tree in front of Jill Bondar's house, he was engaging in selective enforcement of a city ordinance for the purpose of interfering with the plaintiffs' First Amendment rights.

As this court noted in its June 11, 2007 decision, in *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984), the Court made clear that public officials may not enforce a viewpoint neutral ordinance in such a way as to engage in viewpoint discrimination; that is, enforce such an ordinance in a biased manner and against certain individuals because of the views they express. Indeed, it is well-established that the government "may not selectively enforce [its] laws in ways that violate other rules, such as the prohibition of racial discrimination, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), or the first amendment - [the government] could not, for example, [enforce a law in a way that benefits] Republicans but not Democrats." *Archie v. City of Racine*, 847 F.2d 1211, 1218 n. 7 (7th Cir. 1988).

Furthermore, it is well-established that a public official may not engage in the selective enforcement of a law or ordinance in retaliation for an individual's exercise of his First Amendment rights. *See Wayte v. United States*, 470 U.S. 598, 614 (1985) (holding that defendant can be prosecuted in spite of speech, but not because of it); *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 497 (1999) (Ginsburg, J., concurring) ("Under our selective [enforcement] doctrine, 'the decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights.") (internal quotations omitted). Indeed, "[j]ust as it is obvious that application of a facially neutral law may violate the equal protection clause, *see Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886), so too may the application of a facially neutral law so as to discriminate against certain speakers or ideas violate the First Amendment." *Field Day, LLC v. Suffolk*, 463 F.3d 167, 193 (2d Cir. 2006).

And so the question to be answered in the instant case is whether the plaintiffs have produced evidence that is sufficient for a reasonable trier of fact to find that, when D'Amato instructed his aide to take the sign off the tree in front of Jill Bondar's house, he was engaging in selective enforcement of the city ordinance in retaliation for the plaintiffs' exercise of their First Amendment rights. Answering this question requires an examination of the elements of a selective enforcement claim.

In *United States v. Armstrong*, 517 U.S. 456 (1996), the Court stated:

> The requirements for a selective-prosecution claim draw on "ordinary equal protection standards." The claimant must demonstrate that the federal prosecutorial policy "had a discriminatory effect and that it was motivated by a discriminatory purpose." *To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted.* This requirement has been established in our case law since *Ah Sin v. Wittman*. Ah Sin, a subject of China, petitioned a California state court for a writ of habeas corpus, seeking discharge from imprisonment under a San Francisco County ordinance prohibiting persons from setting up gambling tables in rooms barricaded to stop police from entering. He alleged in his habeas petition "that the ordinance is enforced

> 'solely and exclusively against persons of the Chinese race and not otherwise.'" *We rejected his contention that this averment made out a claim under the Equal Protection Clause, because it did not allege "that the conditions and practices to which the ordinance was directed did not exist exclusively among the Chinese, or that there were other offenders against the ordinance than the Chinese as to whom it was not enforced."*

517 U.S. at 465-66 (citations omitted; emphasis added).

Taking its direction from *Armstrong*, the Sixth Circuit in *United States v. Anderson,* 923 F.2d 450 (6th Cir. 1991) set forth quite neatly a three-part test for proving that selective enforcement occurred in a particular case:

> First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, [the official] must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

923 F.2d at 453 (citations omitted); *see also Rabinovitz v. Rogato*, 60 F.3d 906, 909-10 (1st Cir. (1995).

And in *Gardenhire v. Schubert*, 205 F.3d 303 (6th Cir. 1999), the court emphasized that, with respect to the first element, "it is an absolute requirement that the plaintiff make at least a prima facie showing that similarly situated persons outside her category were not prosecuted." 205 F.3d at 319 (quoting *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997)).

Although the Seventh Circuit may not have set forth the elements of a selective enforcement claim as neatly as did the Sixth Circuit in *Anderson*, that court did similarly make clear in *Hedrich v. Bd. of Regents of the Univ. of Wis. Sys.*, 274 F.3d 1174 (7th Cir. 2001), that "[i]n order to make out an equal protection claim . . . [the plaintiff] had to present evidence that the defendants treated her differently from others who were similarly situated." *See* 274 F.3d at 1183; *see also Kozlowski v. Fry*, 238 F. Supp.2d 996, 1023 (N.D. Ill. 2002) ("In order to state a cause of action under the equal

protection clause, plaintiffs must prove that they were intentionally treated differently from others who were similarly situated and that there is no rational basis for that difference in treatment.").

Of course, in the case at bar there was no "prosecution" of any sort, either civil or criminal. Rather, the claimed constitutional violation is predicated solely on the removal of a sign which advocated against the Overlay District Project and which was displayed (in violation of a facially neutral city ordinance) in front of Jill Bondar's house. But given the holdings in the above-cited cases, it logically follows that, if Jill Bondar is (or any of the plaintiffs are) to be allowed to proceed to trial, they must produce evidence to show that persons similarly situated to Jill Bondar and who were in favor of the Overlay District Project were treated differently than she was treated. Stated another way, Jill Bondar must produce evidence to show that persons who had displayed signs (or other written expressions) in favor of the Overlay District Project and in a manner that was in violation of the city ordinance did not, unlike her, have such signs (or other written expressions) removed by the defendant or by someone else at his direction. No such evidence has been produced by the plaintiffs.

To be sure, the plaintiffs have produced evidence claiming to show that in 2008 D'Amato failed to remove "political signs" that were displayed in plain sight of his residence and in violation of the city ordinance. The plaintiffs' argument with respect to such occurrence is presented in their brief as follows:

> More troubling are the facts related to a political sign that was recently posted in plain sight of D'Amato's residence, which he has not removed or, apparently, asked the authorities to remove. Sometime prior to January 17, 2008, two signs were placed between the grassy (now, snowy) area between the sidewalk and the road at 3000 N. Stowell Street. The signs are located in the same general area between the sidewalk and the road where the sign was located in front of Jill Bondar's home. The signs are standard yard-sign size, about 18 by 24 inches, and express support for Sam McGovern-Rowen, who is presently running to replace Alderman D'Amato in the Third Aldermanic District. Alderman D'Amato has publically endorsed McGovern-Rowen. The signs have been in place for at least a month. D'Amato lives

14

> immediately across the street and one house over from the house where the signs are being displayed. The signs are clearly visible from in front of Alderman D'Amato's house.
>
> Against this background, a reasonable jury could almost certainly conclude that D'Amato has chosen to enforce the sign ordinance in a manner that leaves standing (and unsuppressed) political speech that he actively espouses, while removing (and suppressing) political speech that he finds unsavory.

(Pls' Br. at 3-4.)

In my opinion, the plaintiffs' argument is unavailing. First of all, what D'Amato did or failed to do in January 2008 has little, if any, relevance to what he may have done three and one-half years earlier in September 2004. More substantively, however, even assuming that D'Amato intentionally took no action to remove the signs supportive of McGovern-Rowen, the fact remains that the factual scenario involving McGovern-Rowen and his 2008 aldermanic candidacy is not "similarly situated" to the factual scenario involving the Bondars and their 2004 opposition to the Overlay District Project. After all, the scenarios occurred during entirely different time frames and involved entirely different matters. To be sure, if D'Amato was engaged in removing signs supportive of McGovern-Rowen's opponent, while not removing those supportive of McGovern-Rowen (even though both were posted in violation of the city ordinance), a supporter of McGovern-Rowen's opponent who posted a removed sign might very well have a viable First Amendment selective enforcement claim against D'Amato. But, in my opinion, such a speculative factual scenario goes nowhere in aiding the Bondars to succeed on their particular First Amendment selective enforcement claim.

The plaintiffs also argue that D'Amato's track record in removing signs is arbitrary and inconsistent. Specifically, they assert:

> D'Amato lacks the legal authority to enforce the ordinance but nevertheless sometimes removes signs. His track record of enforcing the ordinance is startlingly inconsistent and arbitrary. For example, one of the criteria D'Amato uses when deciding whether to remove a sign is whether it is "convenient" for him to remove it. In addition, D'Amato may cho[o]se to remove a sign if he unilaterally determines that it is easier to remove the sign on his own, rather than to report the sign to the

> appropriate city department. D'Amato also chooses to remove signs if he feels that
> the signs are "obvious and egregious." During his deposition, when pressed for an
> example of a sign that was "obvious and egregious," D'Amato mentioned a "Ron
> Paul for President" sign. On the other hand, when D'Amato noticed a number of
> political signs posted prior to the 2004 election, he chose to refer the signs to the
> election committed for removal rather than remove them himself. This track record
> clearly suggests that D'Amato has chosen to enforce the ordinance without any
> consistent intelligible standard.

(Pls' Br. at 3.)

Once again, even assuming that D'Amato's efforts to personally "enforce" the ordinance were shown to be something less than consistent, such general showing would go nowhere in demonstrating that persons similarly situated to Jill Bondar and who were in favor of the Overlay District Project were treated differently by D'Amato than she was treated.

The bottom line is that the plaintiffs have failed to produce evidence from which a reasonable trier of fact could conclude that persons who posted signs in favor of the Overlay District Project were treated differently than Jill Bondar was treated. Stated another way, the plaintiffs have failed to make "at least a prima facie showing that similarly situated persons" (i.e., those who supported the Overlay District Project and who posted signs in violation of the ordinance) did not have their signs torn down by D'Amato. *See Gardenhire,* 205 F.3d at 319.

In conclusion, the defendant's renewed motion for summary judgment must be granted for the simple reason that, despite their making a noble effort to do so, the plaintiffs have failed to produce sufficient evidence to satisfy the first element of a selective enforcement claim.

**NOW THEREFORE IT IS ORDERED** that the defendant's renewed motion for summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiffs' complaint and this action be and hereby are **DISMISSED**;

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

**SO ORDERED** this 31st day of March 2008, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge